**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION**

**CITY OF PETAL, MISSISSIPPI**                                                                  **PLAINTIFF**

**v.**                                                      **CIVIL ACTION # 2:08cv152-KS-MTP**

**ASHBRITT, INC.**                                                                               **DEFENDANT**

**MEMORANDUM OPINION AND ORDER**

This Cause is before the Court on the motion to remand [Doc. #4] filed by Plaintiff City

of Petal, Mississippi ("Petal").  Defendant Ashbritt, Inc. ("Ashbritt") has failed to establish that it

acted under color of federal office, for the purposes of the federal officer removal statute, 28

U.S.C. § 1442(a)(1), and the Court therefore lacks subject matter jurisdiction.  As a result, Petal's

motion to remand should be **granted**.

**I.  FACTUAL BACKGROUND**

Ashbritt engaged in the debris cleanup and removal process pursuant to a contract with

the United States Corp of Engineers following Hurricane Katrina in 2005.  *See generally*

Contract [Doc. #1-4] (July 22, 2008).  In its state court complaint, filed June 19, 2008, Petal

alleges that Ashbritt acted negligently while engaged in the cleanup and removal process.  Pl.'s

St. Ct. Comp. at ¶¶ 6-7 [Doc. #1-3] (July 22, 2008).  Specifically, Petal alleges that Ashbritt

"negligently allowed enormous piles of saw dust and other shredded wood products to

accumulate" and that this negligence caused the landfill debris pile to catch fire on consecutive

days.  *Id.* at ¶¶ 7-8.

Petal filed suit in the Circuit Court of Forrest County, Mississippi, to recover for the costs

it expended when it responded to the fires and monitored the debris plies.  *Id.* at ¶ 11.  Ashbritt

removed the case to this Court on July 22, 2008, contending that the Court has jurisdiction under

the federal officer removal statute, 28 U.S.C. § 1442(a)(1).  Def.'s Notice of Removal at ¶ 3

[Doc. #1].  Petal filed the instant motion to remand on August 5, 2008.  [Doc. #4].


## II.  STANDARD OF REVIEW

The defendant, as the party urging jurisdiction upon the Court, bears the burden to

establish the existence of federal jurisdiction.  *B., Inc. v. Miller Brewing Co.*, 663 F.2d 545, 549

(Former 5th Cir. Unit A Dec. 1981).

> The federal officer removal statute permits a defendant to remove to federal court a
> state-court action brought against the "United States or any agency thereof or any
> officer (*or any person acting under that officer*) of the United States or of any agency
> thereof, sued in an official or individual capacity for any act under color of such
> office . . . ."

*Watson v. Philip Morris Cos., Inc.*, 127 S. Ct. 2301, 2303-04 (2007) (quoting 28 U.S.C. §

1442(a)(1)).  Defendants removing under § 1442(a)(1) must demonstrate: (1) "that they are

'persons' under § 1442(a)(1)"; (2) "that the defendants acted pursuant to a federal officer's

directions and that a causal nexus exists between the defendants' actions under color of federal

office and the plaintiff's claims"; and (3) "the assertion of a 'colorable federal defense.' " *Id.* at

398-400.


## III.  APPLICATION AND ANALYSIS

The Plaintiff concedes that the first and third elements for removal under § 1442(a)(1) are

satisfied.  Hence, the Court need only determine whether the Defendant, "in carrying out the

'acts' that are the subject of the [Plaintiff's] complaint, was 'acting under' any 'agency' or 'officer' of the United States." *Watson*, 127 S. Ct. at 2304. This second element can be viewed as two separate requirements: Ashbritt must have acted "under color of federal office" and there must be a "causal nexus" between those actions and Petal's claims. *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 398 (5th Cir. 1998). "The words 'acting under' are broad, and . . . the statute must be 'liberally construed.' " *Watson*, 127 S. Ct. at 2304-05 (quoting *Colorado v. Symes*, 286 U.S. 510, 517 (1932)); *accord Winters*, 149 F.3d at 398 (the right of a federal official to raise a defense arising out of his official duties, "is not to be frustrated by a grudgingly narrow interpretation of the removal statute.").

Nonetheless, the statute's "broad language is not limitless." *Watson*, 127 S. Ct. at 2305. Certain activities and relationships are clearly insufficient to satisfy the "acting under" requirement. For example, the Supreme Court has held that a company does not act under color of federal office simply by complying with federal regulatory agency directions, regardless of how intensive or comprehensive the regulations are. *Watson*, 127 S. Ct. at 2303; *id.* at 2307 ("[T]he private person's 'acting under' must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior."). Moreover, the element is not satisfied when a company follows basic contractual parameters after the government has simply entered the market to obtain goods or services. *See, e.g.*, *Joseph v. Fluor Corp.*, 513 F. Supp. 2d 664, 673 (E.D.La. 2007).

On the other hand, the caselaw reveals at least one sure example of a relationship sufficient to constitute "acting under color of federal office." *See Winters*, 149 F.3d 387. In *Winters*, the court considered a case involving a defendant who had supplied the American

government with Agent Orange (an extremely toxic herbicide).  *Id.* at 390.  The plaintiff in

*Winters*, who had been exposed to Agent Orange, claimed that it was defective and unreasonably

dangerous.  *Id.*  The *Winters* court held that the defendant company had been acting under color

of federal office, noting

> [1] the government's detailed specifications concerning the make-up, packaging, and delivery of Agent Orange,
>
> [2] the compulsion to provide the product to the government's specifications, and
>
> [3] the on-going supervision the government exercised over the formulation, packaging, and delivery of Agent Orange.

*Id.* at 400.

Accordingly, the determination of whether a defendant has acted under color of federal

office depends on the level of official control.  The level of official control will be sufficient only

if it is "direct and detailed."  *E.g.*, *Guillory v. Ree's Contract Serv.*, 872 F. Supp. 344, 347

(S.D.Miss. 1994); *Hampton v. Owens-Illinois*, No. 06-10929, 2007 U.S. Dist. LEXIS 6229

(E.D.La. Jan. 26, 2007); *McFarlain v. Northrop Grumman Sys. Corp.*, No. 05-1406, 2006 U.S.

Dist. LEXIS 95421 (M.D.La. Feb. 6, 2006); *Jericho Sys. Corp. v. Booz Allen Hamilton Inc.*, No.

3:07-CV-2009, 2007 U.S. Dist. LEXIS 81495 (N.D.Tex. Oct. 31, 2007).  The Court will evaluate

the level of control exerted in this case in the context of the three factors that the *Winters* court

emphasized:[1] (1) the level of detail in the government's specifications; (2) the government's

compulsion with regard to the specifications; and (3) the degree of supervision exercised by the

---

[1] The Court recognizes that *Winters* involved a contract for goods, rather than a service contract.  This distinction will not dissuade the Court from relying on the case, however.  *See Lane v. Halliburton*, No. Civ. A. H-06-1971, 2006 WL 2583438, at *2-3 (S.D.Tex. Sept. 7, 2006) (similarly relying on *Winters* for guidance in a service contract case and downplaying the importance of the subject of the contract).

government.  149 F.3d at 400.

### A.  Degree of Detail in the Government's Specifications

The contract between Ashbritt and the United States Corps of Engineers is relatively

detailed.  The parties, however, are in complete disagreement as to whether the specifications are

*sufficiently* detailed for the purposes of § 1442(a)(1).

Ashbritt argues that the contract is sufficiently detailed, focusing on those provisions

containing the most comprehensive instructions.  Among the most detailed terms of the contract,

are the provisions directing the construction of an inspection tower and a hazardous materials

containment area.  *See* Contract at ¶¶ C2.7.4.1, C2.7.5.1.  These provisions mandate in great

detail the composition, dimensions, and features of the structures.  *See id.*[2]  In addition, the

contract contains detailed direction concerning the circuit interrupters to be used in the electrical

equipment.  *Id.* at ¶ C2.8.6.  Finally, Ashbritt notes that the contract required debris cleanup and

reduction to be accomplished via mechanical means and/or burning.  *See id.* at ¶¶ C2.2.5, C2.2.8-

---

[2] ¶ C2.7.4.1 states "The contractor shall construct an inspection tower using pressure treated wood.  The floor elevation of the tower shall be 10 foot above the existing ground elevation.  The floor area shall be 8' by 8', constructed of 2"x8" joists, 16" O.C. with 3/4" plywood supported by four 6" x 6" posts.  A 4 foot high wall constructed of 2" x 4" studs and ½ inch plywood shall protect that perimeter of the floor area.  The floor area shall be covered with a corrugated tin roof.  The roof shall provide a minimum of 7 ft. of headroom below the support beams.  Wooden steps shall provide access with a handrail.  Include the construction of a work table, 4' x 2-1/2' x 3/4" plywood supported at all four corners.  The inspection tower shall be adequately anchored."

¶ C2.7.5.1 states "The contractor shall construct a hazardous material containment area. This area shall be 30' x 30'.  The perimeter shall be lined with hay bales and staked in place.  The area shall be lined with a heavy gage plastic (or tarp for colder climates where plastic may be too brittle) to provide a waterproof barrier.  Additional plastic or tarp sufficient to cover the area is required to prevent rain or snow from entering the containment.  It is the Contractors (sic) responsibility to be informed of all laws pertaining to the handling of hazardous materials."

2.9.[3]

On the other hand, Petal argues, many of the contract's provisions lack detail.  For

example, one provision requires that Ashbritt be duly licensed, but expressly leaves it up to

Ashbritt to "be responsible for determining what permits is (sic) necessary to perform under the

contract."  *Id.* at ¶ C2.6.3.  A similar provision requires Ashbritt to maintain a "Comprehensive

Hazard Communication Program," but expressly leaves it up to Ashbritt to develop and

implement the program.  *Id.* at ¶ C2.8.4.

After thoroughly reviewing the contract, the Court concludes that there is insufficient

detail to support a finding that Ashbritt acted under color of federal office.  In addition to those

provisions listed above, the Court notes the following provisions, which delegate significant

autonomy and authority to Ashbritt providing general guidance only:

> C2.6.5 The Contractor shall be responsible for control of pedestrian and vehicular traffic in the work area.
>
> C2.7.3.1 Once the dumpsite is located, the contractor shall provide a Site Management Plan. . . . The plan shall . . . address . . . [a] access to site [b] Site preparation - clearing, erosion control, and grading [c] Traffic control procedures [d] Safety [e] Segregation of debris [f] Location of ash disposal area, hazardous material

---

[3] ¶ C2.2.8 states "Debris shall be reduced by mechanical means using chippers, grinders, or shredders as specified in the task order.  The storage area and processing area for the debris reduction operation shall be designated by the COR based upon the site opportunities and constraints.  The size of the debris pile allowed at the designated location shall be specified prior to the start of debris reduction.

¶ C2.2.9 states "Debris reduction by burning.  There is no industrial standard for Air Curtain Pit Burning.  Air curtains are widely used in many areas.  If used, contractor shall dig a pit 8 ft to 9 ft wide, and 14 ft deep with an impervious bottom layer of clay at least 1 ft. deep.  Ends sealed to a height of 4 ft.  Seal nozzle end with 12 inches of dirt.  Warning stops at least 1 ft high.  Airflow should be 2 ft. below the top edge of the pit.  Ensure minimum nozzle velocity of 8,800 ft/min (100mph) and volume of 900 cf/min/linear ft.  Pit no longer then (sic) the length of the blower nozzle.  Burn pits must be set back a minimum of 100 ft. from debris pile.  Safety distance of at least 1,000 ft.  Extinguish fire 2 hours before removing ash."

containment area, contractor work area, and inspection tower   [g] Location of incineration operations, chipping operation (if required) . . . . [h] Location of existing structures or sensitive areas requiring protection.

C2.8.2 <u>Accident Investigations and Reporting</u>. . . . Accidents shall be investigated and reports completed by the immediate supervisor of the employee(s) involved and reported to the Contracting Officer or his/her representative immediately and the accident report submitted . . . within one working day . . . .

C2.8.5 <u>Daily Inspections</u>.  The Contractor shall perform daily safety inspections and record them on the forms approved by the Contracting Officer . . . . Each report shall include, as a minimum, the following: (1) Locations of areas where inspections were made. (2) Results of the inspections, including nature of deficiencies observed and corrective actions taken, or to be taken, date, and signature of the person responsible for its contents.

While the contract contains several extremely detailed provisions, listed above, as a whole it reveals that the government merely entered the market to obtain a service.  The level of detail is simply insufficiently comprehensive to establish direct and detailed control by the United States Corps of Engineers.  *C.f. Reed v. Fina Oil & Chem. Co.*, 995 F. Supp. 705, 710-12 (E.D.Tex. 1998) (holding second element satisfied where "almost every aspect of the actual operation of the plant was supervised or dictated by the federal government.").  Thus, this factor weighs slightly against a finding that Ashbritt was acting under color of federal office.

### B.  Degree to which the Government Compelled Compliance

The record contains no evidence establishing that the government actually compelled compliance with the specifications contained in the contract.  Since Ashbritt bears the burden of production in this regard, this factor weighs against a finding that Ashbritt was acting under color of federal office.  *C.f. Winters*, 149 F.3d at 398 (holding that the second element was satisfied due in part to the fact that the defendant was compelled to deliver Agent Orange to the government under threat of criminal sanctions.).

### C.  Degree of On-Going Supervision by the Government

The contract itself reveals that Ashbritt, rather than the government, was primarily

responsible for supervision of the debris cleanup and removal process.  The following provisions

of the contract support this finding:

> C2.5.1 The Contractor shall submit a report . . . by the close of business each day .
> . . . Each report shall contain, at a minimum, the following information: . . . Daily
> and cumulative hours for each piece of equipment[;] Daily and cumulative hours
> for personnel, by unit cost or[;] Daily and cumulative cubic yards removed . . . .
>
> C2.6.2 The Contractor shall supervise and direct the work, using skilled labor and
> proper equipment for all tasks.  Safety of the Contractor's personnel and
> equipment is the responsibility of the Contractor . . . .
>
> C2.7.1.1 The dumpsite foreman is responsible for management of all operations of
> the site to include, traffic control, dumping operations, segregation of debris into
> burnable, mixed, and metal materials, burning and chipping, and safety.
>
> C2.7.2.1 The night foreman is responsible for managing all night operations that
> will be limited primarily to burning, unless adequate lighting and suitable
> conditions, as approved by the Contracting Officer, permit grinding.
>
> C2.7.2.2 The night foreman will be responsible for monitoring and documenting
> equipment and labor time and providing the daily operational report to the
> contracting officer's representative.

These provisions, as well as the contract as a whole, reveal that Ashbritt supervised the debris

cleanup and removal process.  None of the record evidence indicates the government directly

supervised the process.  Accordingly, this factor similarly weighs against a finding that Ashbritt

was acting under color of federal office.  *See Kaye v. Southwest Airlines Co.*, No.

3:05-CV-0450-D, 2005 U.S. Dist. LEXIS 18389 (N.D.Tex. Aug. 29, 2005) ("a significant

amount of government control and supervision is necessary to establish that a private entity acts

under the color of federal authority.").

**D.   Conclusion: Ashbritt was not Acting Under Color of Federal Office**.

The level of official control in this case was insufficient to justify a finding that Ashbritt acted under color of federal office.  The contract does not contain sufficient detail to merit such a finding and there is too little evidence of direct control and supervision by the government.

## IV.  CONCLUSION

Ashbritt has failed to meet its burden of establishing the existence of federal jurisdiction in this case, as it has not established that it was acting under color of federal office when it conducted the debris cleanup and removal.  The Court finds that the government merely entered the market to procure a service.  As a result, Ashbritt's removal was not justified under the federal officer removal statute.

IT IS, THEREFORE, ORDERED AND ADJUDGED that the motion to remand [# 4] is **granted**.

SO ORDERED AND ADJUDGED on this, the 22nd day of September, 2008.

*s/Keith Starrett*
UNITED STATES DISTRICT JUDGE